# In the United States Court of Federal Claims

No. 17-2031C
Filed Under Seal: May 29, 2018
Reissued: June 1, 2018[1]

```
*************************************
                                     *
CENTECH GROUP, INC.,                 *
                                     *
         Plaintiff,                  *    Denial of Post-Award Bid Protest;
                                     *    Blue & Gold Fleet, L.P. v. United
    v.                               *    States, 492 F.3d 1308 (Fed. Cir.
                                     *    2007); 28 U.S.C. § 1491(b)(4);
THE UNITED STATES,                   *    5 U.S.C. § 706(2)(A); Denial of
                                     *    Permanent Injunction
         Defendant,                  *
                                     *
    and                              *
                                     *
SALIENT CRGT, INC.,                  *
                                     *
         Defendant-Intervenor.       *
                                     *
*************************************
```

*J. Bradley Reaves*, ReavesColey, PLLC, Chesapeake, VA, for Plaintiff; Of Counsel, *Beth V. McMahon*, Reaves Coley, PLLC, Chesapeake, VA.

*Stephen C. Tosini*, Senior Trial Attorney, *Chad A. Readler*, Acting Assistant Attorney General, *Robert E Kirschman, Jr.*, Director, *Deborah A. Bynum*, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant; Of Counsel, *Charles G. McCarthy*, Assistant Regional Counsel, U.S. General Services Administration, Office of Regional Counsel, San Francisco, CA.

**OPINION AND ORDER**

**DAMICH, Senior Judge**

On December 26, 2017, Plaintiff Centech Group, Inc. ("Centech") filed this post-award bid protest challenging the decision of the General Services Administration ("GSA" or "Agency") to deduct 600 points from Centech's self-score in an award of

---

[1] The original Opinion was filed under seal. The parties have conferred as to the necessary redactions and those redaction have been made in this public opinion. Redacted sections appear with brackets as follows: "[. . .]."

1

contracts in connection with the Alliant 2 government-wide acquisition contract ("GWAC") under Request for Proposals No. QTA0016JCA003 ("The RFP" or "Solicitation").[2] The GWAC is a Multiple Award, Indefinite Delivery, Indefinite Quantity ("IDIQ") contract to provide information technology ("IT") services to a wide variety of federal agencies. In its protest, Centech alleges that GSA abused its discretion by failing to exercise any discretion whatsoever. Specifically, Centech alleges that GSA acted unreasonably by deducting points from its score solely for the lack of a signature that was beyond Centech's control especially in light of the fact that GSA could have verified or clarified Centech's leading edge technology ("LET") relevant experience through the information it had on hand or by reaching out to the identified contracting officers ("CO"). Centech, therefore, requests the Court to enter judgment on the administrative record in its favor and restore its award eligibility.

The Court adopted the litigation schedule as provided by the parties and entered its scheduling order on January 5, 2018. Pursuant to the scheduling order, the Administrative Record was timely filed on January 19, 2018. Defendant-Intervenor, Salient CRGT, Inc., was granted leave to intervene on February 2, 2018.[3]

On February 9, 2018, Centech filed its motion for judgment on the administrative record ("Pl. Mot."). Defendant timely filed its response to Centech's motion for judgment on the administrative record and cross motion for judgment on the administrative record on March 3, 2018 arguing that (1) Centech's protest is untimely, or in the alternative, that (2) GSA reasonably required a CO's signature for certification of certain projects.

The parties timely filed their respective responses and replies with briefing completed on March 26, 2018.

On April 10, 2018, the Court granted defendant's unopposed motion to supplement the record to reflect a change in scoring to one of the awardees on the procurement.

---

[2] Centech originally filed its protest at the GAO which was dismissed on December 20, 2017, without any decision on the merits because another bidder had challenged the same procurement in this Court. Five other related bid protests were also filed in this Court and assigned to the undersigned. *See OBXtek, Inc. v. United States*, Case No. 17-1849C; *Octo Consulting Group, Inc., v. United States*, Case No. 17-2056C; *Capgemini Gov't. Solutions LLC v. United States*, Case No. 18-3C; *Harris IT Services Corp. v. United States*, Case No. 18-24C; and *Dynetics, Inc., v. United States*, Case No. 18-481C. Two of them have since been voluntarily withdrawn. *See Harris IT Services Corp. v. United States*, Case No. 18-24C at ECF No. 17; *Capgemini Gov't. Solutions LLC v. United States*, Case No. 18-3C at ECF No. 47.

[3] Defendant-Intervenor did not participate in the briefing.

For the reasons that follow, the Court **DENIES** Centech's motion for judgment on the administrative record and **GRANTS** defendant's cross-motion for judgment on the administrative record.

**I.     Facts**

**A. The Solicitation**

GSA first published notice of its intent to procure under the RFP in FedBizOps in January 2014. AR at 1. GSA made its first draft RFP public in March 2015, AR at 412, and received more than 900 comments regarding draft RFPs by December 2015. AR at 1891.

On June 24, 2016, GSA issued the RFP. AR at 1887. The RFP provided for a 5-year base period, one 5-year option period, and a total ceiling value of $50 billion for all task orders. AR at 1386, 1334. The RFP further provided that GSA would issue multiple awards to the top sixty highest-rated offerors on a best-value bases to "the highest technically rated offerors with a fair and reasonable price." AR at 1581-82. Offerors were to self-score their proposals in the following categories:  relevant experience; past performance; systems, certifications, and clearance; and organizational risk assessment. AR at 1517-80. GSA would then verify the scoring during proposal evaluation. AR at 1582. Based on the offeror's answers, the scoring worksheet auto-calculated its score out of a possible 83,100 points. AR at 30306. In the event of a tied score, "all Offerors precisely tied at the 60th position will receive an award." AR at 1582. The awardees would then be permitted to bid on a series of fixed-price, cost reimbursement, time-and-materials, and labor-hour task orders to provide IT services to various federal agencies. AR at 1333.

Relevant to this protest is the evaluation under LET relevant experience projects. Offerors could earn points for LET relevant experience. AR at 1556. The RFP provided for offerors to identify as many as 30 different leading edge projects by verifying up to three previous leading edge projects in each of the following 10 areas: (1) artificial intelligence; (1) autonomic computing; (3) big data; (4) biometrics; (5) cloud computing; (6) cyber security; (7) health IT; (8) mobile IT; (9) the internet of things; and (10) virtual networking. AR at 1559. It defined LETs as "highly sophisticated and cutting edge developments in the extensive field of information technology. . . ." AR at 319.

The RFP included the requirement that the offerors use a particular template, Form J.P-3, to document their LET experience in accordance with section L.5.2.3.1.1 of the RFP. AR at 1539. Under section L.5.2.3.1.1:  "Any other format will be rejected as a material non-conformity." AR at 1539. The RFP was explicit, "[i]n order to receive points for each submitted Leading Edge Technology Relevant Experience project . . . [t]he completed Attachment J.P-3, Relevant Experience (Leading Edge Technology) Project Template must be signed by a Contracting Officer ("CO") with cognizance over the submitted project." AR at 1556; s*ee also* AR at 645-46 (J.P-3 form for signature).

### B. Published Answers Regarding Signature Requirement

In published questions and answers, the CO acknowledged the signature requirement for verification of LET experience:

> QUESTION 15:   In the event that one or more of our customers does not return signed J.P-2 and/or J.P-3 forms in time for proposal submission, will the Government please confirm that an offeror's proposal will not be dismissed if there is a discrepancy between the LET/PSC 1-1, 1-2, 1-3 project identifier numbering on the J.P-2 and J.P-3 forms and the self scoring worksheet?
>
> RESPONSE: *The Offeror may not claim points without all the required forms or without the proper citation signed by the client agency.*

AR at 1935 (emphasis added).

> QUESTION 26: Will the government allow Project Identifiers (Attachment J.P-3, Part 1. Project Identification, 8th row) on the signed template to be hand corrected after the CO has signed and returned the completed LET template? . . .
>
> RESPONSE:  No.

AR at 1938.

> QUESTION 5: If the Contracting Officer elects to have the COR sign the template because they are in a better position to verify the technical aspect of the citation, will that be acceptable if COR email notification is provided to the CO by the COR that they have signed the LET template on their behalf? Should the Offeror submit a copy of the actual email with our bid?
>
> RESPONSE: The J.P-2/J.P-3 forms require the Contracting Officer's name and contact information; however, the signature of the CO, or COR in lieu of the Contracting Officer, is acceptable. . .

AR at 1948.

> QUESTION 11: If the government issued a contract award with "signature on file" in the signature block, will GSA consider it a valid document for verification purposes?

>RESPONSE: Yes, we will accept an award document presented to us that shows the "signature on file." However, the J.P-2 and J.P-3 ***must have actual signature, or e-signature*** (including CAC Authenticated Electronic Signature).

AR at 1957-58 (emphasis added).

>QUESTION 22: For the J.P-2, Relevant Experience (PSC Group) Project Template, and the J.P-3, Relevant Experience (Leading Edge Technology) Project Template, may a verification signature be provided by an individual who no longer has cognizance over the project (*i.e.*, the individual has moved on to a new position in the Government, or left Government entirely)?
>
>RESPONSE: No, ***a current Contracting Officer***/ Contracting Officer Representative or other recognized official with cognizance over the project ***needs to sign***.
>
>QUESTION 23: Will the Government accept a SOW/PWS for verification instead of the signature of a cognizant Government official on the J.P-2 or J.P-3?
>
>RESPONSE: Signatures are generally required for J.P-2. The only exception that a signature is not required on the J.P-2 is when the FPDS-NG Report is Available, Complete and Accurate. ***Signatures are required for ALL J.P-3 templates***.

AR at 1970 (emphasis added).

>QUESTION 24: In Section L.5.2.3.1.1 the RFP states "NOTE: If Attachment J.P-3 ... requires a signature". In what circumstances does the J.P-3 require a signature?
>
>RESPONSE: Attachment J.P-3 templates ***always require a CO/COR signature*** pursuant to L.5.2.3.1.1 . . .
>
>QUESTION 28: If a project being submitted for the Leading Edge Technology Relevant Experience has an accurate FPDS report and current CPAR report, will the government consider removing the requirement for Attachment J.P-3 to be signed by the Contracting Officer?
>
>RESPONSE: No. A completed Attachment J.P-3 with ***a signature is always required. No exceptions***. See all subsections under Section L.5.2.3.

5

> QUESTION 29: In cases for our DoD customers can the Verification of LET Relevant Experience J.P-3 be signed by the Senior Agency Program Director in charge?
>
> RESPONSE: No, **only a cognizant CO or COR can sign** the verification.

AR at 1971 (emphasis added).

### C. Proposal Submission, Evaluation, and Award

Centech timely filed its proposal in response to the RFP, along with 169 other offerors. AR at 30306. In its proposal, Centech included a number of J.P-3 Forms regarding its LET experience. *See* AR at 25490-26876. With respect to one past contract, Centech attached an email from an Air Force CO who declined to sign the J.P-3 Form because he "ha[d] not been the contracting officer on this effort for four years." AR at 25951. Centech was likewise unable to include a CO's signature for a Department of Transportation (DOT) project, as the CO failed to respond to any of Centech's requests. AR at 25604-25608. In lieu of signatures for these two projects, Centech attached documents showing it made efforts to obtain the required signatures. AR at 25606-25613. Even without the required signatures, Centech added these two projects to its technical self-score culminating in a total score of [. . .]. AR at 30333. GSA deducted 600 points from the proposal for these two LET projects that did not have the required signature, resulting in a final technical score of [. . . ]. AR at 30333-34.

GSA named a total of 61 awardees, with a tie occurring at slot numbers 59 through 61. AR at 30306. The awardee technical scores ranged 83,100 to 73,600 at slots 59, 60, and 61, and any technical score below 73,600 was ineligible for award. AR at 30306.

### II. Legal Standards

The Court has jurisdiction under the Tucker Act, 28 U.S.C. section 1491(b)(1). The Tucker Act, as amended by the Administrative Disputes Resolution Act of 1996, 28 U.S.C. section 1491(b)(1), grants this Court exclusive jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). Under the Tucker Act, an "interested party" includes an actual or prospective offeror whose direct economic interest would be affected by or which has suffered a non-trivial competitive injury or prejudice as a result of the alleged error. *Sys. Application & Tech., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

The Court sustains procurements so long as the action was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. §

1491(b)(4); 5 U.S.C. § 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), overruled on other grounds, *Califano v. Sanders*, 430 U.S. 99 (1977); *Ramcor Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999).

In reviewing the Agency's procurement decisions, the Court recognizes that the decision is entitled to a "presumption of regularity," *Citizens to Preserve Overton Park*, 401 U.S. at 415 (citations omitted), and that the Court should not substitute its judgment for that of the agency. *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220 (1997); *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations."). The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues." *Impresa*, 238 F.3d at 1332 (citations and quotes omitted). "An agency's decision will be upheld so long as it was not 'clearly erroneous,' and there was a rational basis for the decision." *Int'l Res. Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 161 (2005) (quoting *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 353 (2004)). Furthermore, the Court must give the procuring agency considerable deference in matters requiring technical judgment. *Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 740 (2007) ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment.").

The Federal Circuit has held that challenges to the terms of a solicitation itself, as opposed to the evaluation of proposals responding to a solicitation, must occur prior to the deadline for receipt of proposals when these are based on alleged patent errors. *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1313 (Fed. Cir. 2007). A party's failure to do so is a waiver of its ability to raise the same objection in a bid protest action in this Court. *Id.* at 1313. "This doctrine was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact." *Id*. at 1313-14 (citing *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1580 (Fed. Cir. 1993)).

Therefore, a preliminary question to address in considering plaintiff's protest is the nature of the challenge brought—in other words, whether the terms of the Solicitation itself, or the Agency evaluation of Centech's proposal, is being challenged.

### III.   Discussion

#### A.   Has Centech Waived its Right to Protest?

*Blue & Gold Fleet*, teaches "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in

a bid protest action in" this Court.  492 F.3d at 1313.  Moreover, an unsuccessful bidder may not re-write the solicitation to suit its needs in a post-award protest after sleeping on its rights before bidding.  *Id*. at 1314.

In its opening brief, Centech admits that it knew that its bid did not meet the signature requirement for two LET projects.  Pl.'s Mot. at 3-5.  Centech further states that "[t]he RFP unambiguously states that bidders would not receive points in connection with their claimed LET experience unless the form was signed by either the CO or COR."  *Id*. at 3.  As well, Centech acknowledges that by including this provision, GSA "invoked a formal requirement" in the solicitation, albeit "a formal requirement that served no purpose."  Pl.'s Reply at 4.  These admissions, advance the government, compel a finding that Centech's claims are barred under *Blue & Gold Fleet*.  Def. Reply at 1-2.

Centech argues that there is no ambiguity in the Solicitation; but by Centech's own admission, it admits that it did not know whether the documents it submitted in lieu of the signed J.P-3 Form would be accepted.  *See* Pl.'s Reply at 4 ("[Centech] did not know whether the Government would accept documentation it submitted of its efforts and whether it would factor in [its] complete lack of control over the other governmental agency's action.").  Even so, Centech argues that it is not challenging the solicitation terms but "it is challenging the Government's conduct during evaluation."  Pl.'s Reply at 4.  Thus, Centech maintains that it is the lack of Agency action with the documents that formulates the basis of its challenge.  *Id*.

Although Centech attacks the reasonableness of the requirement, it admits that there is no ambiguity.  The thrust of its brief is that the Agency applied the requirement rigidly, indeed, "robotically."  On balance, the Court concludes that Centech is challenging the conduct of the Agency during the evaluation, not the terms of the solicitation.  The Court, therefore, disagrees with the government's characterization of Centech's challenges and the challenges are timely as a post-award protest.

The Court must, therefore, address the merits of the protest, *i.e.*, were the Agency's actions reasonable?

### B.   Was GSA's Signature Requirement Reasonable?

In general, COs conducting negotiated procurements award contracts to "responsible offeror[s] whose offer *conforming to the solicitation* will be most advantageous to the Government, price and other factors considered."  48 C.F.R. § 52.212-2(a) (emphasis added).  Indeed, awards based on non-conforming proposals may "violate[] the procurement statutes and regulations."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (citations omitted).

The facts are simple in this case.  The RFP stated ". . . Project Template **must be signed** by a Contracting Officer ("CO"). . . ."  AR 1556 (emphasis added).  Not only was the language clear, the signature requirement was reinforced through extensive answers and questions regarding the J.P-3 Form.  *See supra* Section I.B.  Centech knew that its

proposal did not meet the J.P-3 Form signature requirement with two of its LET projects. By attaching the email requests to those COs in lieu of the signatures, Centech tried to overcome its deficiency. Thus, there is no argument that Centech did not have the required signatures and did not conform to the solicitation. Yet, it is Centech's position that the Agency's point deduction for lack of signatures served no rational basis. Pl. Mot. at 7-8. Additionally, Centech argues that the Agency's failure to exercise discretion by verifying or clarifying its concerns was an abuse of discretion. Pl. Mot. at 9. And finally, Centech argues that the Agency acted arbitrarily when it elevated form over substance. Pl. Mot. 12-14. The Court disagrees with Centech for the following reasons.

### 1. There was a rational basis.

Centech alleges that the signature requirement did not serve any actual purpose or rational basis. However, the government provided several reasons for the solicitation's signature requirement. Specifically:

> ● The CO for each previous project was in the best position to objectively assert whether a past IT project actually qualified under the RFP's definitions of the LET categories.
>
> ● The CO signature was necessary because the relevant CO or COR is the individual most qualified to make that determination.
>
> ● The most reliable and accurate arbiter of a given project's qualification under a given LET category is the CO or COR responsible for that project.

Gov. Mot. at 8-9. These reasons provide ample support for the signature requirement in order to verify LET experience.

Furthermore, the RFP defined LETs as "highly sophisticated and cutting edge developments in the extensive field of information technology . . . ." AR at 319. Therefore, when there are engineering and scientific considerations, it has been held that when a court is reviewing an agency's technical expertise and experience, "it should defer to [the Agency's] analysis unless it is without substantial basis in fact." *Cube Corp. v. United States*, 46 Fed. Cl. 368, 375 (2000) (quoting *Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, reh'g denied, 405 U.S. 948 (1972)). Thus, verification of LET experience was reasonable and in accordance with an RFP seeking specialized technical knowledge.

### 2. GSA reasonably exercised its discretion.

Centech further argues that the Agency failed to exercise discretion by verifying its LET projects. Pl. Mot. at 9. Furthermore, Centex argues if the Agency had any questions or concerns about its LET experience it was obligated to clarify its concerns. *Id*.

The RFP contemplated clarification, stating: "The Government may conduct clarifications, as described in FAR § 15.306(a)." AR at 1582. However, the government has wide discretion in determining whether a clarification should be sought. Even so, "a contracting officer's actions can still be arbitrary and thus not substantially justified." *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 512 (2014).

Here, the Agency did not verify or ask for clarifications regarding the two LET projects claimed by Centech and rejected for points by the Agency. It is Centech's position that the Agency was "obligated to exercise its discretion and do something." Pl. Mot. at 12. In support, Centech argues that in this same procurement, after the bids were submitted and in the context of past performance evaluations, the Agency acted reasonably by waiving an email requirement regarding past performance finding that the requirement did not serve any purpose. Pl. Mot. at 11. Because the past performance email requirement was not necessary for the relevant analysis and because a deduction for other than negative performance would be unfair and unreasonable, compliance was waived by the Agency. Pl. Mot. at 11-12.

Thus, it is Centech's argument that the signature requirement for the J.P-3 Forms was similar to the waived email requirement in that the signatures did not provide any additional relevant data points. Pl. Mot. at 12. Centech further argues that because the Agency knew that it had not been at fault in not obtaining the signatures,[4] the Agency was obliged to take some action. *Id*. For instance, Centech argues that the requirement could have been waived; the Agency could have independently verified the LET experience by contacting the CO or another agency representative; the Agency could have asked for additional information from Centech as a clarification; or the Agency could have looked at alternate information available to it. *Id*.

The RFP directed bidders to "**attach verification documents** . . . Any other format will be rejected as a material non-conformity. NOTE: The **Offeror must substantiate** all the information through the **verification method** identified in Section L.5.2.3.1.1." AR at 1539 (emphasis added). Consequently, the RFP placed the burden on the offerors to provide the verification of its LET experience by requiring the signature. This

---

[4] Centech asserts that it made many "continued" and "substantial," attempts to get the required signatures. Pl. Resp. at 2. However, the record shows that Centech did not begin seeking signatures from COs until shortly before bids were due. For LET 1-3, Centech initiated its efforts with an email to the Department of Transportation on September 28, 2016, only 10 business days before the solicitation closing date. AR at 25612. A few more emails followed, all sent on the eve of, or just following, the end of the busiest time of year for any Federal Government contracting office. AR at 25606-12. With respect to LET 6-2, the record indicates that Centech started its request for signature with an email dated September 29, 2016; again, on the eve of the end of the fiscal year. AR at 25952. Thereafter, Centech followed up with two more emails in early October, on the eve of the proposal due date. AR at 25952-53. Thus, the record clearly indicates that Centech waited to last the minute to get the required signatures and the Court cannot agree with Centech that its efforts were "substantial."

requirement was reasonable.  For instance, Centech provided a number of J.P-3 Forms with its bid.  *See* AR at 25277-26902.  In addition, the other 169 bidders provided at least some forms.  *See*, *e.g.*, AR Index, (identifying LET forms for bidders included in the AR).  If GSA waived the signature requirement for the LET projects, this would shift the burden onto the COs to review possibly thousands of contracts performed by the 170 bidders and to contact COs for those contracts to obtain those COs' views as to whether the contracts were "leading edge" under one or more of 10 categories.  Instead, it was a reasonable requirement that bidders prove that they have "leading edge" experience by obtaining signatures from COs on their own contracts.  Thus, GSA reasonably exercised its discretion by requiring the signatures in order to capture the LET points.

### 3.   GSA did not act arbitrarily with form over substance.

Centech appears to contend that the Agency should have waived the signature requirement.  Pl. Mot. at 3.  Centech argues that by requiring the signatures, signatures that it could not obtain, the Agency put "form over substance."  Pl. Mot. at 13-15.  This argument must fail.  If GSA waived the signature requirement for Centech, not only would it be contrary to the RFP signature requirement, it would now be unreasonable and unfair to all of the other bidders, some of whom may have complied with the solicitation and not included in their bids past projects that were not verified through CO signatures.  Centech was on notice, and it was clear from the answer and questions, that failure to comply with the Solicitation LET project requirements would be "a material non-conformity."  AR at 1539.  Thus, a bidder who followed the RFP directions would not have included pages in its bid that it knew would be rejected.  The Court, therefore, holds that the Agency did not act arbitrarily when it required that the LET experience projects required the CO's signature.

## IV.   Denial of Permanent Injunctive Relief

In order to establish that it is entitled to permanent injunctive relief, the plaintiff must establish actual success on the merits.  The foregoing analysis reveals that there is no basis upon which to grant Centech's motion for judgment on the administrative record.  As such, Centech has failed to establish an entitlement to injunctive relief, *i.e.,* it has failed to show actual success on the merits.

## V.   Conclusion

For the reasons set forth above, the Court **DENIES** Centech's motion for judgment on the administrative record and **GRANTS** defendant's cross motion for judgment on the administrative record.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Edward J. Damich  
EDWARD J. DAMICH  
Senior Judge